UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

UNITED STATES                          :

     v.                                :  Crim. No. 23-170 (CJN)

DAVID ELIZALDE                         :

### DEFENDANT'S MEMORANDUM IN AID OF SENTENCING[1]

COMES NOW Defendant, David Elizalde, through undersigned counsel, Stephen F. Brennwald, Brennwald & Robertson, and submits that a 14-day period of home detention,[2] an appropriate number of hours of community service, as well as restitution, would constitute a sentence that is sufficient, but not greater than necessary, to accomplish the goals enumerated in 18 U.S.C. § 3553(a) under the unique circumstances of this case.[3]

### *Procedural Background*

Mr. Elizalde is before this Court after having been found guilty of one count of Parading, Demonstrating, or Picketing in a Capitol building, in violation of 40 U.S.C. § 5104(e)(2)(G).  That charge carries a maximum term of six months in prison, and a maximum fine of $5,000.  Because this offense is a Class B

---

[1] Undersigned counsel deeply apologizes for the late submission of this memorandum.  Counsel has been working on the memorandum for weeks, but, quite frankly, was having great difficulty conceptualizing his arguments in this case, given its unusual nature.

[2] Such a sentence would allow Mr. Elizalde to continue working during the week, preventing an interruption in his ability to serve the United States.

[3] Defendant proposes this sentence, which does not include a period of probation, because a) Mr. Elizalde is in the Navy, and the military does not want to enlist, or retain, individuals who are on probation, and b) there is no possibility whatsoever that Mr. Elizalde would violate any terms of probation, making such a penalty completely unnecessary.

misdemeanor, the United States Sentencing Guidelines do not apply. USSG §1B1.9.

Mr. Elizalde has no criminal history points, never before having been arrested.

He initially appeared before a magistrate-judge in this district on April 3, 2023, and was released on his personal recognizance.  He remains in that status.

He has fully complied with his conditions of release ever since his arrest – a period of over 12 months.

Mr. Elizalde is scheduled to be sentenced on Friday, April 19, 2024.

### General Background

Defendant was charged in connection with the very unfortunate circumstances that took place at the United States Capitol on January 6, 2021.

On that day, Mr. Elizalde, like thousands of others, came to Washington, D.C. to hear a speech by the former president.  After the speech, he, along with many other individuals, walked to the United States Capitol.

Although those walking to the Capitol had been instructed by various speakers to "fight" to keep the former president in power, and many in the crowd were energized, angry, and spoiling for a fight, Mr. Elizalde was not of that mind. At all.

Rather, as a student of history, and with a great deal of curiosity, he walked among the crowd, observing the events and alternately photographing or videotaping various scenes.

He stood on the West lawn for quite a while, and eventually walked to the northwest side of the Capitol, finding a non-gated, unobstructed terrace occupied by many other people.

From there, he walked toward an open door on the West side of the Capitol, and after waiting in line a few minutes, he entered the Capitol for a period of about three minutes.[4]

Video recordings show that within a very short period of time after he entered, he encountered a group of police officers who were not blocking the doorway but were standing back inside of the room.[5]

One of the officers pointed Mr. Elizalde toward the exit (where he had just entered), and according to Mr. Elizalde (the video recording does not include sound), instructed Mr. Elizalde to leave the building.

Mr. Elizalde then turned away from the officer, and after looking up at the ceiling and at the room in general, he moved toward the exit.

He was in that room for a total of about three and a half minutes, including the time before the officer spoke to him, as well as the two or so minutes that he had to wait in line to leave.  He went nowhere else in the Capitol, and after

---

[4] Mr. Elizalde spent more than half of that time waiting in line to exit.

[5] Defendant is not suggesting in any way that the police wanted anyone to enter through that door or were encouraging anyone to do so.  He merely notes that the officers were not physically blocking that entrance at the time he entered.  Police officers had been blocking that entrance earlier but were overpowered by the mass of people who pushed against them.  Mr. Elizalde did not see any of that activity before he entered.

walking around to the East side of the Capitol, he left the Capitol grounds altogether.

In December of 2021 and in early 2022, Mr. Elizalde was interviewed by agents of the Naval Criminal Investigative Service about his presence inside and outside the Capitol. The interviews took place at the Naval Base in Rota, Spain, where Mr. Elizalde was then stationed.

In his statements, Mr. Elizalde admitted to the foregoing, though he erroneously estimated that he had been in the Capitol for less than 30 seconds.

Following its investigation, the Navy transferred Mr. Elizalde from Spain to the Washington Navy Yard facility, and when he flew to Washington for his new assignment, he was arrested and charged with these offenses.

### *The Scene Inside and Outside the Capitol that Afternoon*

As this Court well knows having presided over quite a few January 6 cases, the people who were outside and/or inside the Capitol that afternoon exhibited varying types of behavior.

Some, as has been shown in numerous video recordings and social media posts, were prepared for battle, wearing military-style outfits, carrying different types of weapons (guns, sticks, batons, flagpoles that were used as weapons, pepper or bear spray, etc.) and implements of battle (zip ties, rope, etc…).

Many of these people had posted their intentions on social media well before January 6, 2021, some indicating that it was time for a civil war, and that they would not accept the official results of the election that were certified by the

50 States.  Mr. Elizalde did not post any messages on social media regarding the election or about January 6.

Others went into the Capitol to find politicians and harm them.  Some of those individuals gathered at various strategic points inside, as well as outside, the building, pushing against police officers who were attempting to secure entrances to the Capitol, as well as to areas where politicians were present.

Mr. Elizalde never pushed anyone, including any police officer, and never joined a crowd that was doing so.  He also had no weapon of any kind.

It is clear that while some in the crowd were prepared for a physical battle, others went to the Capitol to shout, scream, and protest the official results of the election.  Mr. Elizalde did not even do that, never joining in any chant such as "four more years!" or "we want Trump!"

Other protestors destroyed property and otherwise vandalized some areas within the building.  Mr. Elizalde did none of that, as he only entered one room right inside the entry door for a very short period of time.

Some individuals threw flagpoles, stolen police shields, chairs, water bottles, and other objects towards police officers.  Some gathered in a lower tunnel (artificially created for the inauguration that was to take place on January 20, 2021) and attempted to push their way into the building that way.

Others sprayed officers with various substances and were otherwise very hostile and demonstrative toward the police, aggressively screaming in their faces.

Mr. Elizalde, on the other hand, remained calm throughout, merely observing what was happening around him.

### What Mr. Elizalde did that Afternoon

Mr. Elizalde's actions at the Capitol on January 6, 2021, were as benign as they could have been, given the circumstances.

He first milled about outside the Capitol for a period of time, observing history as it unfolded.  He filmed the crowd and the scenery.

There is no question that he observed others engaging in activity that was illegal, including people climbing scaffolding, and otherwise acting in a disorderly manner.

He, however, never participated in any such activity, nor did he in any way encourage it.  When others shouted at the police, he did not join in.  When the crowd chanted "USA, USA!" or "Whose House, Our House!" he did not join in.

When others went into a lower tunnel on the West side of the Capitol and attempted to push past a line of police officers, he did not join in.  In fact he never went near that tunnel.

Before he briefly entered the Capitol building, Mr. Elizalde's actions consisted of standing around, walking around, and photographing or videotaping the events that were taking place.

He never participated in any activity that involved even slight contact with police officers, or any historical objects, and he never climbed or walked over any

bike racks, fencing, or other structure intended to obstruct unlawful entry onto the grounds or into the building.[6]

After observing events from his vantage point on the West lawn, he made his way toward the Capitol building by walking on a walkway that was not blocked in any way, and where many other people were walking, unimpeded.

He eventually arrived at a door that had been open for some time and stood in a line of people who were waiting to enter.  He was not present at that location when the door was breached and did not observe the crowd push police officers back from that entrance.  By the time he arrived, people were walking in and out of that door.

As Mr. Elizalde waited to enter the building, an alarm was sounding.  It would have been impossible for him, or anyone not familiar with the building, to know whether the alarm had been activated by a breach of that door, or by the smoke that was wafting through the general area around the Capitol, or for some other unknown reason.[7]

After entering the Capitol, he very quickly encountered a group of police officers who were standing about 10-20 feet from the entrance.

---

[6] As this Court knows, United States Capitol Police had placed metal bike racks, signs, and so-called snow fencing around certain parts of the Capitol ahead of the events of that day in order to keep out unauthorized individuals.

[7] Many police officers deployed some type of gas that afternoon in an attempt to disperse the crowd, and some people in the crowd also used various types of spray.

Within about 20 seconds of Mr. Elizalde's entry, one of the officers can be seen in a U.S. Capitol CCTV video pointing Mr. Elizalde toward the doorway through which he had just entered.

Mr. Elizalde has indicated in interviews that he also heard the officer tell him that he needed to leave, though the CCTV footage does not include sound.

At that point, Mr. Elizalde did not go any further into the Capitol, but began looking at the ceiling of the room he was in, as well as at the walls.  As noted earlier, Mr. Elizalde is fascinated by history, and he was in awe of his surroundings.

After a short period of time, he turned his body toward the exit to leave, but was forced to wait in a line of individuals before he was able to exit.

After he left the building, Mr. Elizalde walked toward the East side of the Capitol, and then left the premises entirely.

Importantly, neither before nor after January 6, 2021, did Mr. Elizalde ever post any political messages on social media.  He never texted any friends or family about what happened that day, nor did he brag (as so many people did) about his presence on the Capitol grounds that day.  He viewed his own presence there that day as being an observer of history, and not a participant in it.  He acknowledges, however, that his presence at the Capitol was unlawful, and wrong, and he truly regrets his actions that day.

As was brought out during trial, the Navy, for whom Mr. Elizalde worked at that time (and still works to this day), had instructed its members through

official email channels not to attend any "January 6" events that day. Unfortunately, because Mr. Elizalde was on shore leave at that time, he did not have access to military emails, and he never learned of this command.  Had he been in a position to read that email, he never would have gone to Washington, D.C. on January 6, 2021.  Even without receiving an email, however, Mr. Elizalde admits that he should have known better.

### *Analysis of Sentencing Factors*

As this Court knows, pursuant to *United States v. Booker*, 543 U.S. 220 (2005) and *Gall v. United States*, 128 S.Ct. 586, 596-97 (2007), not only are the United States Sentencing Guidelines no longer mandatory, but they are also not even presumptively reasonable.

Whether or not the sentencing guidelines apply, in determining an appropriate sentence, this Court must consider the factors delineated in 18 U.S.C. § 3553(a), and impose a sentence that:

1)  reflects the seriousness of the crime;

2)  promotes respect for the law;

3)  provides just punishment;

4)  deters criminal conduct;

5)  protects the public from further crimes, and

6)  provides the Defendant with any necessary educational or vocational training, medical care, or other correctional treatment.

In addition, this Court must also consider:

1) the nature and circumstances of the offense;

2) the history and characteristics of the defendant;

3) the kinds of sentences available;

4) the sentencing range;

5) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct, and

6) the need to provide restitution to any victims of the offense.

### *The Proposed Sentence Would Reflect the Seriousness of the Crime*

Mr. Elizalde has proposed that this Court impose a sentence of 14 days of home confinement, a number of hours of community service, and restitution. Under the facts of this unique case, this sentence would reflect the seriousness of his crime for the following reasons:

First, his presence on the Capitol grounds that day was as benign as possible considering the day's events. It consisted of walking around the grounds outside the Capitol, and briefly walking into the Capitol itself before obeying an order to leave.

Second, his intent in being there was never to interfere with the election, or to participate in any of the crowd's illegal activities. It was truly to observe what he realized was a momentous event. When it comes to criminal activity, intent obviously matters, and as all of the videos depicting his activities that day

10

demonstrate, his intent was not to commit a crime, but to observe and record what was happening all around him.

Third, while the defendant committed this offense while he was in the military, one should not forget that for 17 years, he has served his country faithfully, garnering multiple commendations, gaining many professional certificates, honorably representing the United States, and voluntarily putting his life on the line by regularly deploying around the world on nuclear aircraft carriers.

While all of that may sound typical of a sailor's life, a sailor's life, especially while deployed – including in the Middle East – is hardly without risk or sacrifice.  That should more than counter-balance Mr. Elizalde's activities on January 6, 2021.

If this Court believes that further or greater punishment is required, it could obviously order a longer period of home detention.

Undersigned counsel has spoken with a representative of the United States Navy about sentences that could cause Mr. Elizalde to be discharged from the Navy, and while that representative did not want to give a direct answer to counsel's question, he did indicate that a sentence exceeding a certain amount of time would likely cause the Navy to discharge Mr. Elizalde.

For that reason, as well as the other reasons discussed above, defendant asks that the Court impose the sentence he has proposed.  That sentence would

certainly be sufficient, but not greater than necessary, to achieve the goals enumerated in 18 U.S.C. § 3553(a).

The government argues in its memorandum that Mr. Elizalde has not shown remorse for his actions.  It makes this claim although the day and time for Mr. Elizalde to speak has not yet arrived.  But Mr. Elizalde is, actually, very remorseful for his actions, and is embarrassed and mortified that his name is now a part of the history of January 6.

### *The Proposed Sentence Must Also Promote Respect for the Law, Provide Just Punishment to Mr. Elizalde, and Deter Criminal Conduct, both by him and by Others.*

These three goals would be met through the imposition of the proposed sentence under the particular circumstances of this case, for the same reasons presented above.

Notably, and perhaps counter-intuitively, respect for the law is actually *diminished* when a sentence is unfairly high.  And, as mentioned above, a more severe sentence may result in Mr. Elizalde's discharge from the Navy, and possibly the loss of a pension he has worked for for nearly two decades.

As to deterrence, Mr. Elizalde does not need to be deterred from future illegal conduct.  His experience going through this legal nightmare has more than taught him a very hard lesson, and there is absolutely no chance that he will ever re-offend.

Deterrence of others, while important in this type of case, would be achieved through imposition of the proposed sentence, as observers who might

learn of that sentence will see it as more than adequate given Mr. Elizalde's very limited participation in the events of January 6, 2021.

### The Need to Protect the Public from Further Crimes.

Mr. Elizalde greatly regrets his presence inside and outside of the Capitol that day and would never participate in such an event again. And, as noted, he never would have gone to Washington, D.C. had he learned that the Navy had emailed its sailors and instructed them not to go to the city that day. But for the fortuitous circumstance that he was on shore leave when the Navy sent out its email, this case never would have existed.

At this time, however, he clearly realizes that even his mere presence at the Capitol that day was a very bad decision. It is a decision that he deeply regrets, as it has cast a negative light not only on him, but on the United States Navy.

Counsel for Mr. Elizalde notes that despite having had a difficult family life growing up, he obtained his high school diploma and then joined the Navy as a young man, sacrificing other more lucrative pursuits for the chance to serve his country. He is rightly proud of his service and hopes to continue serving in the United States Navy for years to come.

Because there is no reason to suspect that he would ever engage in criminal behavior again, as this was a very unique situation, further punishment is not required.

### The Court's Duty to Provide the Defendant with any Necessary Educational or Vocational Training, Medical Care, or Other Correctional Treatment.

Defendant submits that, thankfully, he is not in need of any of the foregoing services.

### *The Need to Avoid Unwarranted Disparities*

This factor is often the most difficult one to evaluate, given the differences between defendants in cases such as these.

*Summary of Other Cases*

When this Court considers other sentences it has imposed in cases involving the same offense, it becomes clear that the sentence Mr. Elizalde proposes is a fair and just one.

For instance, in *United States v. Renee Fatta*, 22-cr-217, this Court sentenced Ms. Fatta to 24 months of supervised release.  The government had recommended a sentence of 14 days of home confinement.

In her case, Ms. Fatta entered the Capitol building, smoked marijuana while in the building, only left when she was forced out by police officers who had deployed pepper spray, and in the days after January 6, posted on Parler that "when I see pics of the senate [sic] laying on their sea[t]s scared it warms my heart."

Here, Mr. Elizalde left when he was instructed to do so, and did not have to be forced out.  More tellingly (about his intent and motivation), he never posted anything on social media, including something as callous as what Ms. Fatta wrote on Parler.

In *United States v. Chad Heathcote*, the government recommended a sentence of 30 days in prison, and the Court imposed a 15-day prison sentence.

The evidence showed that Heathcote entered the Capitol through the Brumidi corridor despite having been told by police officers not to do so.  He then refused another officer's command to leave and had to be forcibly removed.

His initial entry also resulted in about 20 to 30 other rioters entering after him and necessitated the attention of a phalanx of officers to remove the others from the area.

After he was thrown out of the Capitol, Heathcote sent a text message to a friend stating "[w]e own the Capital [sic]."  He also sent another message stating "[w]onder if [Congress] got the message."

The differences between Heathcote's case and Mr. Elizalde's are obvious. Mr. Elizalde left when he was told to do so.  Mr. Heathcote not only refused to leave, but his initial entry into a corridor allowed several dozen other rioters to enter behind him.  Moreover, Mr. Elizalde never posted any messages or sent any texts indicating pride in what he had done.  As noted, his presence there was not intended to commit a crime, but to observe history.  Unfortunately, that resulted in his committing the crime for which this Court convicted him.

In *United States v. William Wilkerson*, 23-cr-249, the government recommended a sentence of 30 days in prison, and this Court imposed a 24-month period of probation.  Wilkerson not only entered the Capitol, as Mr. Elizalde did,

but he bragged about his involvement in the attack on the Capitol in social media postings and did not express remorse for his involvement.

Here, again, Mr. Elizalde never posted any messages on social media at all, much less brag about any involvement in the events of that day. And he is truly remorseful for his actions.

In *United States v. Weston Sobotka*, 22-cr-388, the government recommended a sentence of 21 days of incarceration, and this Court imposed a sentence of 15 days of intermittent confinement (the government is recommended twice that sentence here, i.e., 30 days of intermittent confinement).

Sobotka's conduct on that day, however, was leaps and bounds beyond that of Mr. Elizalde. For instance, Sobotka not only entered the Capitol, but advised others who were entering to hold the doors open so others could enter. He also stayed in the Capitol for 28 minutes, taking video and photos. Finally, after the event Sobotka sent a selfie to a friend of a photo that had been taken inside the Rotunda with a message stating, "I'm storming the [Capitol] haha."

Here, Mr. Elizalde never encouraged anyone else to enter, or engaged in any activity that helped others enter. He only stayed in the Capitol about 3 minutes, most of which was spent waiting in line to exit. And he never sent any messages to anyone whatsoever, much less one bragging about having stormed the Capitol. The differences between these two cases are significant.

In *United States v. Jeffrey Hubbard*, 21-cr-737, this Court imposed a 45-day sentence on the 47-year-old Army veteran. It imposed such a sentence

16

because of Mr. Hubbard's aggressive conduct toward the police, his threat to engage in physical violence with the police, his repeated disobedience of police commands, and his lack of remorse.

According to the evidence, Hubbard witnesses several violent skirmishes between rioters and police inside the Crypt and the Statuary Hall Connector, yet he maneuvered himself to the front of a melee inside the Rotunda and threatened to fight officers there.

In addition, Hubbard did not enter through a door, like Mr. Elizalde did, but through a shattered window next to the Senate Wing door.

Mr. Elizalde, of course, obeyed the police when an officer told him to leave, and he never went beyond the initial room that he entered.  Hubbard not only went through a broken window, rather than a door, but went deeper inside the Capitol, and as far as the Crypt.

And Hubbard was aggressive toward the police, threatening to fight them. Mr. Elizalde, by contrast, obeyed the police command to leave.

Finally, Hubbard was not remorseful for his actions, while Mr. Elizalde is deeply remorseful for his much less severe conduct.

Finally, in *United States v. Landon Manwaring*, 22-cr-270, the government recommended a 45-day prison sentence, and this Court imposed a sentence of 30 days of incarceration.

The evidence showed that Manwaring entered through the same door as Mr. Elizalde, but rather than turn around and leave, he went into the Crypt, and

then finally to an area near the office of former speaker Pelosi.  He stayed in the Capitol or about 30 minutes.

When he was later interviewed by the FBI, he stated that the police had "welcomed" him into the Capitol, and that he had seen no property destroyed.

Finally, after the events of January 6, 2021, Manwaring pled guilty to "dealing in harmful material to a minor" in the State  of Utah.

Again, the differences between this conduct, which resulted in a prison sentence of 30 days, and the actions of Mr. Elizalde, are striking, and merited the sentence this Court imposed.

### Mr. Elizalde's Military Status

The government has argued that because Mr. Elizalde engaged in the conduct he did while in the military, a sentence that deters him and others from engaging in such conduct again is warranted.  *Gov. Sent. Memo*., ECF Doc. 48, at 16.

While defendant understands the argument, he counters that consideration should be given to his 17 years of service to his country.  Not only has he served his country honorably for nearly two decades, but he has served in theaters of war that are extremely dangerous, and on ships – nuclear aircraft carriers – that are frontline targets for America's enemies in the Middle East.

He has continually pursued further training as an aircraft mechanic, earning many certificates that prove how hard he has worked throughout his time in the Navy to improve himself and be of greater service.

One can clearly make the argument that someone in his shoes should be held to a higher standard.  On the other hand, one must also recognize that he has sacrificed a great deal of his life in service to his country – and that must certainly counter-balance the first argument.

Financially speaking (and this is an argument that counsel has thought of, not one that Mr. Elizalde has asked counsel to make), he has remained in the Navy well beyond his original commitment term, foregoing a great deal of money that he could have earned in the private sector.

Someone with Mr. Elizalde's experience, working for a private contractor or company, could earn well over $100,000 a year, especially given his background.  Yet Mr. Elizalde has not "quit the Navy," choosing instead to re-enlist over and over, sacrificing a great deal of income by remaining a sailor who, after 17 years in the Navy, still earns only about $72,000 a year.

Speaking of sacrifice, one must not forget that not only did Mr. Elizalde sacrifice a great deal of money by staying in the military, but he has continually risked his life by going on multiple deployments on nuclear aircraft carriers in the Middle East – the most combustible war zone imaginable.

Beyond that, and very significantly, as a result of multiple months-long deployments to far-flung parts of the world, he has also sacrificed many years of any personal life he may have otherwise enjoyed.  Such deployments are notoriously difficult on personal relationships, and Mr. Elizalde has been at sea for many months on much more than one occasion.

In the abstract, one can tend not to appreciate what our military members do for their country, or the many sacrifices they make for us.  And while we can say that this is a choice they made, it is a choice that allows us not to risk our lives, to sacrifice our fortunes, or to forego our meaningful personal relationships.  It is an immense sacrifice indeed.

Thus, the arguments regarding his military status cut both ways, and defendant contends that his years of sacrifice should counter-balance the mistake he made by being on the grounds of the Capitol, and inside the Capitol (for three minutes) on that fateful day.[8]

### *Conclusion*

Mr. Elizalde, a 17-year veteran of the Navy, will stand before this Court on Friday, April 19, 2024, to answer for his actions on January 6, 2021.

He deeply regrets his presence there.  And although his conduct that day was on the lowest end of criminality when placed in context, it was wrong for him to be where he was, even for three minutes (inside the Capitol).

Undersigned counsel's primary concern for Mr. Elizalde at this stage is his ability to remain in the military

As noted earlier, the military does not countenance its members being on probation, as it cannot be bound by a person's duty to report to a probation officer,

---

[8] Speaking of sacrifice, one must not forget that not only did Mr. Elizalde risk his life over and over by being on multiple deployments on nuclear aircraft carriers in the Middle East, but he also sacrificed a great deal of any personal life he may otherwise have enjoyed as a result of overseas deployments that lasted months at a time.

or attend Court, while on deployment or stationed overseas.  That is why the military will not accept a person who seeks to enroll while a criminal case is pending, or while that person is on probation.  It does not want to be, and indeed cannot be, responsible for, or bound by, a person's obligations to a court.  Thus, imposing a period of probation in this unusual case[9] could, and likely would, be fatal to Mr. Elizalde's continued service in the Navy.

In light of this, defendant asks that if this Court determines that a sentence more severe than that which he has proposed is warranted, it impose a longer period of home confinement, but hopefully no more than 30 to 60 days, as that is apparently the range undersigned counsel was warned (by a Navy officer) should not be exceeded.

Mr. Elizalde will also gladly perform community service – a punishment that not only will give him even more time to think about what he has done, but will also benefit the community in which he lives.

Given Mr. Elizalde's limited behavior on January 6, his steady and full-time employment history, his service to his country, and his honest remorse about his actions on that day (and determination never to become involved in something like that again), he asks this Court to impose the sentence he has proposed, or any other sentence that takes into account all of the considerations he has raised in this memorandum.

---

[9] Mr. Elizalde notes that other defendants who have been sentenced in January 6 cases seem to be military veterans, and not current, active-duty, members.  This difference is critical when considering a sentence of incarceration and/or probation.

Respectfully submitted,

/s/

_____
Stephen F. Brennwald, Esq.
Bar No. 398319
Brennwald & Robertson, LLP
922 Pennsylvania Avenue, S.E.
Washington, D.C.  20003
(301) 928-7727
(202) 544-7626 (facsimile)
E-mail:  sfbrennwald@cs.com

<u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that a copy of the foregoing was sent by email, this 17th day of April, 2024, to all counsel of record.

/s/

_____
Stephen F. Brennwald