**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

UNITED STATES OF AMERICA,

             Plaintiff,

      vs.

DAVID ELIZALDE,

             Defendant.

_____/

Criminal Action
No. 1:23-170

Washington, DC
April 19, 2024

10:07 a.m.


TRANSCRIPT OF SENTENCING
**BEFORE THE HONORABLE CARL J. NICHOLS**
UNITED STATES DISTRICT JUDGE

APPEARANCES:

**For the Plaintiff:**     **Patrick Holvey**
                         **Julie Bessler**
                         U.S. ATTORNEYS OFFICE - D.C.
                         601 D Street NW
                         Washington, DC 20001
                         Email: julie.bessler@usdoj.gov
                         Email: patrick.holvey@usdoj.gov

                         **Jason Manning**
                         DOJ-CRM
                         1400 New York Avenue NW
                         Washington, DC 20005
                         Email: jason.manning@usdoj.gov

**For the Defendant:**    **Stephen F. Brennwald**
                         BRENNWALD & ROBERTSON, LLP
                         922 Pennsylvania Avenue, SE
                         Washington, DC 20003
                         Emails: sfbrennwald@cs.com

**Reported By:**        **LORRAINE T. HERMAN, RPR, CRC**
                         Official Court Reporter
                         U.S. District & Bankruptcy Courts
                         333 Constitution Avenue NW
                         Washington, DC 20001

*** Proceedings recorded by stenotype shorthand.
*** Transcript produced by computer-aided transcription.

1              **P R O C E E D I N G S**

2              **DEPUTY CLERK:**  Good morning, Your Honor.  This is

3    criminal case year 2023-170, *United States of America versus*

4    *David Elizalde.*

5              Probation officer is Kaylyn Shaffer.

6              Counsel, please come forward to introduce

7    yourselves for the record beginning with the government.

8              **MR. HOLVEY:**  Good morning, Your Honor.

9    Patrick Holvey for the United States, along with Assistant

10   U.S. Attorney, Julie Bessler and Assistant U.S. Attorney,

11   Jason Manning.

12             **THE COURT:**  Good morning, everyone.

13             **MR. BRENNWALD:**  Good morning, Your Honor.  Stephen

14   Brennwald for Mr. Elizalde.

15             **THE COURT:**  Mr. Brennwald and Mr. Elizalde, good

16   morning.

17             **THE DEFENDANT:**  Good morning, sir.

18             **THE COURT:**  We are here to sentence Mr. Elizalde

19   on the parading, demonstrating or picketing in a Capitol

20   building count.  Are the parties ready to proceed?

21             **MR. HOLVEY:**  For the government, Yes, Your Honor.

22             **MR. BRENNWALD:**  Yes, Your Honor.

23             **THE COURT:**  So two, I guess, pieces of background

24   or things to state for the record or to let you know how I

25   would like to proceed, I suppose all of those things are

1    true.

2         In preparation for today, obviously, in addition

3    to having presided over the trial and so knowing a lot about

4    the facts in this case, I've reviewed Probation's

5    presentence investigation report and recommendation, the

6    government's sentencing brief and Mr. Elizalde's sentencing

7    brief, which includes the letters from his brother and

8    coworker.

9         Are there any other written materials I should be

10   aware of that I haven't mentioned?

11        **MR. HOLVEY:**  Not that we are aware of, Your Honor.

12        **MR. BRENNWALD:**  Not from the defense, Your Honor.

13        **THE COURT:**  Thank you.

14        So today I think there are three steps for us to

15   accomplish.  First, I'll consider any objections to the PSR

16   and make my factual findings with respect to it.

17        I'll then hear from the parties about what they

18   believe an appropriate sentence here is and, Mr. Elizalde,

19   at that time if you would like to address the Court; and

20   third, I will pronounce the sentence.

21        Obviously, again, there's an entire record in this

22   case.  But as it relates to the PSR, it appears that neither

23   party has any outstanding objections to the circumstances of

24   the offense as detailed therein; is that correct from the

25   government's perspective?

1          **MR. HOLVEY:**  Your Honor, as to the facts presented

2      in the presentence report, no, there are no objections.

3          The government notes that restitution is not

4      available in this case because it's a Title 40 offense not a

5      Title 18 offense.  We missed that in the PSR report and so

6      Probation's recommended restitution but the government's

7      position is that restitution is not available.

8          **THE COURT:**  If I recall correctly, you put that in

9      your brief; is that right?

10         **MR. HOLVEY:**  Correct.

11         **THE COURT:**  Yes.  I noticed that in the brief.

12         Let me ask this question:  Do you agree that I

13     could, if I thought it was warranted, impose a fine?

14         **MR. HOLVEY:**  Yes.

15         **THE COURT:**  Okay.  Thank you.  Thank you for that.

16         **MR. HOLVEY:**  Thank you.

17         **THE COURT:**  Mr. Brennwald, any objections from

18     Mr. Elizalde's perspective?

19         **MR. BRENNWALD:**  No, Your Honor, it is true, I

20     think I mentioned restitution in my memo and it actually

21     should be a fine so...

22         **THE COURT:**  Okay.  Thank you.  I'll ask you about

23     the nature and the size of the fine at that point.

24         Mr. Elizalde, have you had a chance to review the

25     presentence investigation report and to discuss it with

1    Mr. Brennwald?

2              **THE DEFENDANT:**  I have, Your Honor.

3              **THE COURT:**  Did you have enough time to talk to

4    him about that report and the briefs that have been filed by

5    the parties?

6              **THE DEFENDANT:**  I have.  I did.

7              **THE COURT:**  Are you satisfied with Mr. Brennwald's

8    services?

9              **THE DEFENDANT:**  Very.  Thank you.

10             **THE COURT:**  Pursuant to Rule 32, I accept the

11   factual findings contained in the PSR regarding the

12   circumstances of the offense and I adopt them for the

13   purposes of imposing a sentence.  I'm also incorporating the

14   entire record otherwise in this case.

15             I want to now hear from the parties -- this is

16   step two -- about why they believe the sentence they've

17   suggested is correct.  Mr. Holvey, why don't we start with

18   the government.

19             **MR. HOLVEY:**  Thank you very much, Your Honor.

20             Honor, courage, commitment, these are the core

21   values of the United States Navy.  These each are values

22   that the defendant, Navy Petty Officer David Elizalde,

23   betrayed with his actions on January 6th, 2021.

24             His actions, as part of the violent riot that

25   desecrated our nation's capital were without honor.  His

1    actions, standing silently by as rioters violently attacked

2    Metropolitan police officers who bravely answered the call

3    to defend our Capitol, were without courage.

4           And his actions undermining the public safety,

5    public order and our republic through his participation in

6    the January 6th Capitol siege demonstrated a lack of

7    commitment to his sworn oath to support and defend the

8    Constitution of the United States.

9           Today the government asks this Court to hold

10   David Elizalde accountable for each and every unlawful

11   action this Court found he undertook on January 6th as it

12   sentences him on Count 4, violation of 40 U.S.C. 5104(e)(2).

13          The government recommends this Court impose a

14   sentence of a period of probation of 36 months with the

15   condition of intermittent confinement totaling 30 days.  The

16   government also requests this Court impose 60 hours of

17   community service.  And the government's already noted the

18   availability of a fine but does not recommend a fine in its

19   recommendation, leaves it to the Court's discretion.

20          The government's prepared a brief highlight

21   overview of Mr. Elizalde's conduct on January 6 for the

22   Court.

23          **THE COURT:**  Does the government agree with

24   Mr. Elizalde's representation based, I guess, on

25   conversations with Navy officers that, if he were sentenced

1  to probation and/or probation with 30 days of intermittent

2  confinement, that he might lose his job?

3          **MR. MANNING:**  The government doesn't have any

4  information on that, Your Honor.  And to the government's --

5          **THE COURT:**  Does the government think that that's

6  a question I should be asking myself as I impose a sentence

7  here?  Differently, would the government prefer that

8  Mr. Elizalde keep his job or not?

9          **MR. MANNING:**  The government doesn't have a

10  position on that.  That's a decision for the Navy.  And as

11  to whether or not the Court should consider it, the

12  government's position is that the Navy is relying on this

13  Court to make an objective independent determination of an

14  appropriate sentence so that then it can decide what to do,

15  if anything, in light of that sentence.

16          This Court should let the Navy make its own

17  determinations about what's right, just and appropriate

18  given the circumstances, including what the appropriate

19  sentence is rendered by this Court.  Trying to get ahead of

20  the Navy or guess as to what effect the sentence might have

21  will only frustrate the navy's ability to make its own

22  decision.

23          And to the extent that this sentence impacts

24  Mr. Elizalde's career that results in unfortunate

25  consequence of his personal choices and actions on

1    January 6th, it is and was Mr. Elizalde's responsibility to

2    look after and care for his professional career.  His lack

3    of care with respect to his future in the Navy does not make

4    his career a responsibility of this Court.

5           After attending the Stop the Steal Rally on the

6    Mall on January 6th, 2021, Mr. Elizalde headed to the

7    Capitol.  On his way to the grounds immediately outside the

8    Capitol, Mr. Elizalde noticed numerous barricades, at least

9    some of which he acknowledged, he realized the crowd had

10   forced its way through.

11          Did that stop Mr. Elizalde?  No.  He continued and

12   entered the restricted Capitol grounds.  His path, once at

13   the Capitol, is shown here.  I want to highlight two

14   locations specifically with a brief note about the third.

15          First, after arriving at the restricted grounds

16   north of the Lower West Terrace, Mr. Elizalde recorded a

17   video, Exhibit 508.  The screenshot accurately captures the

18   gist of what he saw at that time.

19          He saw Capitol Police stationed at the

20   West Terrace steps aiming riot-control weaponry at the

21   rioters below and instructing them to leave and disperse.

22   He saw rioters climbing over walls and railings, and he saw

23   first responders active at the scene, here, giving CPR to a

24   rioter.  Did any of these signs dissuade Mr. Elizalde?  Did

25   he leave?  No and no.

1              Sergeant DesCamp described at trial the

2    extraordinary nature of the Capitol Police engagement that

3    day, how less than lethal munitions had never been deployed

4    prior to January 6th, and how on January 6, they not only

5    deployed them, they deployed all of them.

6              They depleted their stock of munitions and all it

7    did was hold back the riot because there were too many

8    rioters present that day.  As soon as one fell back, two

9    more took its place.  Mr. Elizalde was part of that critical

10   mass of rioters undermining U.S. Capitol Police and

11   Metropolitan Police Department crowd control measures.

12             And, remember, Mr. Elizalde personally felt the

13   effect of those munitions experiencing firsthand the effect

14   of the deployed tear gas.  Speaking of Metropolitan Police

15   Department, Mr. Elizalde then saw the arrival of Civil

16   Disturbance Unit 42 under the command of

17   Lieutenant Hackerman.

18             Mr. Elizalde witnessed and recorded

19   Lieutenant Hackerman and CDU42's altercations with the crowd

20   and the sudden and vicious assault that the crowd of rioters

21   committed against CDU42 at about 2 p.m. that day.

22             We see here how close Mr. Elizalde was to

23   Lieutenant Hackerman as captured on his body-worn camera.

24   And we saw at trial the violence experienced at the hands of

25   the rioters by Lieutenant Hackerman.  And we saw how

1   Mr. Elizalde witnessed, recorded and did nothing to prevent

2   or otherwise help against that violent onslaught.

3           And I have Mr. Elizalde's recording, 514, if the

4   Court would like to view it.

5           **THE COURT:**  No, it's okay.  I recall.

6           **MR. HOLVEY:**  Okay.  Thank you very much,

7   Your Honor.

8           In fact, Mr. Elizalde, after seeing that violence,

9   after having previously passed by barricades breached by the

10  mob, continued on.  Mr. Elizalde continued around the

11  grounds, up and over the Upper West -- up and over to the

12  Upper West Terrace.

13          I'd note here that the defense memo, on Page 6

14  onto 7, states that, quote, He never climbed or walked over

15  any bike racks, fencing or other structure intended to

16  obstruct unlawful entry into the grounds or onto the

17  building because, quote, the U.S. Capitol Police had placed

18  metal bike racks, signs and so-called snow fencing around

19  certain parts of the Capitol ahead of the events of that day

20  in order to keep out unauthorized individuals.

21          But as we saw at trial, the defendant saw and

22  ignored piles of metal bike racks and snow fencing as he

23  looped around the grounds seen here, immediately to his

24  right, as he continued to the Upper West Terrace.

25          Once at the Upper West Terrace, he saw and passed

1    by MPD police cordons, rioters breaking through windows into

2    the Capitol, both of which we know he saw because these are

3    photos that he himself took.

4         He recognized that these images were important

5    enough, they made enough of an impression on him that he

6    stopped to take a photo.  But even so, he disregarded what

7    they indicated about what he should be doing or rather what

8    he should not be doing and he continued on.

9         He continued into the Capitol building and

10   recorded his own unlawful entry into our seat of government

11   at approximately 3:25 p.m.  He entered the Capitol walking

12   over broken class, walking past shattered windows into the

13   riotous, deeply ironic, chant of "USA."

14        And I have Exhibit 530 for the Court if it would

15   like to see it.

16        **THE COURT:**  I think I'm fine.  Thank you.

17        **MR. HOLVEY:**  Thank you, Your Honor.

18        Note here, that Mr. Elizalde only stopped his

19   advance into our republic's hallowed grounds when

20   specifically commanded.  None of the other multitude of

21   signs and signals that should have prevented him from coming

22   anywhere close to this point were sufficient to stop him.

23   Only when he was specifically told by law enforcement to

24   leave did he do so.

25        I want to point out, in defense's sentencing memo,

he states that "As Mr. Elizalde waited to enter the building, an alarm was sounding.  It would have been impossible for him or anyone not familiar with the building to know whether the alarm had been activated by a breach of that door or by the smoke that was wafting through the general area around the Capitol or for some unknown reason."

This is not only not credible but also irrelevant. First, the door was clearly broken open as the video shows and the alarm was coming from the door.  And second, irrespective of why the alarm was sounding, a Senior Chief Petty Officer Ramirez testified at trial, when an alarm is sounding at a door on a military installation, that would typically indicate "that you were typically leaving the area if the alarm is going off, not going into it."

By the time he left the Capitol at Officer Pias's direction, he had been on restricted grounds for over an hour and a half if not more.

What then, when asked to recall these events, did Mr. Elizalde have to say for himself?  During his February 8th, 2023 interview, Mr. Elizalde discussed how he observed rioters fighting with the police but expressed a concern for his safety as a result.

Moreover, even though Mr. Elizalde admitted that, in hindsight, he made a bad decision on January 6th.  He continues to view it as a historic event first and foremost.

1   Rather than expressing remorse for the violence he saw and

2   filmed against police officers and the attack on our

3   nation's capital he said the following:

4        (Video played.)

5            "I did get a -- I always take chances, you

6        know?  Like, I like to do things.  At that point

7        it was just, like -- like I said, I like history.

8        I saw everything that was going on.  I know it was

9        historical and I wanted to observe as much as

10       possible but not at the same time as like I knew

11       what I do as far as my job.  So, I was, like,

12       yeah, I did kind of -- I made a bad decision.  I

13       lost my, like I said, situational awareness.  But

14       it was just curiosity because I know, when all of

15       this is passed and gone 10 years from now,

16       20 years from now, people will be talking about it

17       and they will be, like, hey, were you there?  I

18       will be, like, yes.  Here's my story.  You know?

19       But it was, just historical.  It was

20       just -- that's pretty much it."

21           For the record, that was Exhibit 812 playing from

22   timestamp about 11:16 to 11:18.  That concludes the

23   summation.

24           Turning to the 3553(a) factors, there are no

25   guidelines for this case, so we don't need to discuss that.

1         Turning, first, to the nature and circumstances of

2    the offense, the attack on the U.S. Capitol as the D.C.

3    Circuit --

4         **THE COURT:**  So I think I have a pretty good handle

5    on all of those factors.  But let me ask this question:

6    Compared to other January 6 defendants, who I've sentenced

7    to the parading count, but-for the fact that Mr. Elizalde

8    was an active and is an active service member, what warrants

9    for him, in the government's mind, intermittent confinement

10   when compared to those for whom I imposed probation but not

11   intermittent confinement?

12        **MR. HOLVEY:**  So this Court has had about 19 cases

13   with the sole count -- sole convicted count of

14   5104(e)(2)(G).  The government's recommendation in each of

15   those has been at least a period of probation and sometimes

16   intermittent confinement or incarceration pre *Little*.

17        And this Court has never not sentenced a defendant

18   on this count to probation.  But in a majority of those

19   cases --

20        **THE COURT:**  No, I know.  But you are recommending

21   probation and 30 days of intermittent confinement.  So my

22   question is, as to your recommendation, comparing that

23   recommendation as to the sentences I've imposed in that

24   cohort of cases --

25        **MR. HOLVEY:**  Right.

1          **THE COURT:**  -- what is it that makes Mr. Elizalde

2     more culpable or whatever factor you want to rely on, more

3     deserving of a 30-day period of intermittent confinement

4     than those defendants for whom I have given "probation

5     only"?

6          **MR. HOLVEY:**  There is a risk of a sentencing

7     disparity if this Court does not provide some form of

8     intermittent confinement.  In this case, particularly

9     because, in the majority of the cases that the Court has

10    sentenced to just probation, those were plea agreements

11    where they had accepted responsibility.

12          Mr. Elizalde has not accepted responsibility or,

13    to this point, noticed provided any indication of remorse.

14    There was no remorse at any of the three interviews that he

15    gave to NCIS and the FBI.

16          There's been no remorse shown during any portion

17    of the trial that he elected to show.  And to this point, I

18    think he's going to get up and provide a statement of

19    remorse if I am reading the defense's memorandum correctly.

20    But I would submit that it's remorse for the consequences of

21    his actions having now been convicted not for the actions

22    that he undertook on January 6th.

23          Additionally, I don't think that it is

24    inappropriate for this Court to heavily consider the fact

25    that he is active duty naval service in this case for two

1    reasons.  The first reason is that, unlike other cases where

2    this Court or other courts in the district have sentenced

3    veterans, they are not under an active oath to support and

4    defend the Constitution.

5           And the second aspect is, it seemed, from reading

6    defense's submission, that the urge was that this Court

7    should provide a lesser sentence in view of years of

8    faithful service to the nation.

9           I understand that impulse.  But an enlistment

10   contract or an officer commission does not come with a "get

11   out of jail free card".  The thanks of a grateful nation is

12   expressed to its veterans through the benefits, privileges

13   and obligations provided by and undertaken by the nation

14   through statutory decisions, laying out what compensation

15   is, what benefits are, what obligation the nation has

16   undertaken in terms of long-term healthcare, for example,

17   for our nation's veterans.

18          Those are considered choices.  And Congress has

19   not said that, by joining the Navy or any armed force, you

20   are entitled to leniency in future criminal prosecution.

21   It's not a thing.

22          As a result, putting those together, intermittent

23   confinement is an appropriate recommendation here,

24   consistent with the government's recommendations for plea

25   agreements that it's entered before and taking into account

1    the lack of responsibility in this case.

2         **THE COURT:**  Thank you, Counsel.

3         **MR. HOLVEY:**  Thank you.

4         May I just briefly roll through and make sure I

5    don't have anything else to say?

6         **THE COURT:**  Sure.  I think I have it but please

7    check.

8         **MR. HOLVEY:**  Thank you.

9         Oh, yeah.  Two notes.  The first note is, while

10   Mr. Elizalde was acquitted on the first three counts of the

11   information, this Court did make factual findings as to what

12   his conduct actually was on that day.

13        **THE COURT:**  I recall.

14        **MR. HOLVEY:**  I trust the Court has reviewed that.

15        The second note is, it's important to note that

16   the government did offer Mr. Elizalde a plea to this count

17   that he was convicted on, just Count 4.  If he wanted to

18   accept responsibility, he could  -- for this charge, he

19   could have accepted responsibility at that time and he chose

20   not to.

21        And that is another reason why it's very different

22   from the other situations.  And I would submit that maybe

23   the most likely comparator is the *Galloway* case, which the

24   government cited; former military in that case, not active

25   military, acceptance of responsibility, no remorse, like in

1    this case, but certainly similar enough for a comparator by

2    the Court.

3              THE COURT:  Thank you very much.

4              MR. HOLVEY:  I'm going to check with my counsel

5    real quick.

6              THE COURT:  Please.

7              MR. HOLVEY:  All right.  Thank you.

8              With that, Your Honor, the government thanks the

9    Court for its time and reiterates its requests for a

10   sentence of 36 months probation, intermittent confinement

11   totaling 30 days, and 60 hours of community service with a

12   fine at the Court's discretion.

13             THE COURT:  Thank you very much.

14             MR. HOLVEY:  Thank you very much, Your Honor.

15             THE COURT:  Mr. Brennwald.

16             MR. BRENNWALD:  Your Honor, I've never --

17             THE COURT:  Let's just do this, okay?  There's no

18   dispute that we don't have a plea here.

19             MR. BRENNWALD:  Right.

20             THE COURT:  That Mr. Elizalde was an active

21   service member at the time.  That we had a trial.  He was

22   convicted.  So why, in light of those factors, is the

23   government wrong to say that it would be most consistent for

24   me to sentence Mr. Elizalde to probation plus intermittent

25   confinement?  Plus, of course, I mean, I'm sort of staking

1  the fact that we all know what his conduct was on

2  January 6th.

3          **MR. BRENNWALD:**  Right.

4          So this is not answering your question,

5  unfortunately.  I was going to ask the Court if -- I've

6  never asked for this in all of my years of practice, but it

7  seems like it would be appropriate, in my view, to have

8  Mr. Elizalde make a statement to the Court --

9          **THE COURT:**  First, sure.

10          **MR. BRENNWALD:**  -- before.  I've never asked that

11  but could he do that?

12          **THE COURT:**  I'm happy to do that.

13          **MR. BRENNWALD:**  Okay.

14          **THE COURT:**  Mr. Elizalde.

15          **MR. BRENNWALD:**  And I will answer the question.

16          It's on my computer because he sent me the letter,

17  so I just want to --

18          **THE COURT:**  No problem.

19          **THE DEFENDANT:**  Good morning, Your Honor.

20          **THE COURT:**  Good morning.

21          **THE DEFENDANT:**  I appreciate the opportunity to

22  speak to you and express my thoughts about what has been the

23  tragedy of this country, for this city and for me as well.

24          As you know, 17 years ago, I decided to serve the

25  United States Navy, my country and the military.  Being a

1  sailor gave me a sense of pride and purpose.  While it was

2  difficult adapting to a life at sea and long stretches away

3  from home, I treasured the opportunity to learn new

4  skills --

5       **MR. BRENNWALD:**  He also didn't bring his glasses,

6  so he's having to read my computer as best he can.

7       **THE DEFENDANT:**  -- to help keep the fighting

8  forces ready for contingency and keep my country safe.  I've

9  also, all of my whole life, been a student of history.  I

10  love learning about the past, despite the many trials that

11  the nation has endured.  That is why it deeply distressed to

12  me to accept a part of this very dark moment in this

13  country's history on January 6, 2021.

14       As anyone who knows me understands it would never

15  be and it never was my intention to be part of the

16  insurrection.  I was truly a curious person who wanted to

17  see up close what was happening.  But in this -- but this is

18  where I went wrong, very wrong.

19       And I've exercised much better judgment and

20  applied the wisdom I have learned from over the years, and

21  I've stayed away, not only from the Capitol itself but from

22  the outside -- I should have exercised much better judgment

23  and applied the wisdom that I have learned from over the

24  years and stayed away from not only the Capitol itself, from

25  the outside areas of the building as well.

1              The government's right.  I did see happening what

2       was wrong.  It never should have happened.  I empathize with

3       the pain of the officers who were fighting the crowds, often

4       hopelessly outnumbered.  I empathize with the members of

5       Congress who, while I didn't know at the time, were hiding

6       in place in their office hoping not to be harmed by an

7       unruly crowd.  I empathize with the families of those who

8       were hurt and killed that day.

9              What at the time seemed like a historic day turned

10      out to be one of the darkest days in the history of the

11      nation.  To think that I was part of that is deeply

12      embarrassing, shameful and unbelievable.  To all those who

13      have never -- to all those who were harmed, to those whose

14      faith in our democracy have been shattered and to the

15      country as a whole, I deeply apologize, Your Honor.

16             I will never be able to make up my actions for

17      that day, my presence outside, inside the Capitol.  But I

18      pledge to live my life differently, with more thoughts, more

19      reflection, with greater resolve, to uphold all details of

20      United States ideals that has made this country the greatest

21      country on earth.

22             Again, Your Honor, truly, I am very sorry.

23             **THE COURT:**  Thank you, Mr. Elizalde.

24             **MR. BRENNWALD:**  As I mentioned in my memorandum,

25      first of all, I don't think Mr. Elizalde, in a normal

1  circumstance, would have any issue with probation.  The

2  Court knows that probation is something that is typically

3  imposed because people can fail, people can relapse on

4  drugs, people can commit new crimes and you want to have

5  something over their head.  Probation is meant to make sure,

6  basically, you have them on the hook for as long as

7  possible.

8        That's uniquely not present in this case because

9  of who he is.  It took an extreme event where the former

10 President told people "Come to the Capitol on January 6, it

11 will be wild" for anything to even happen.

12       It also took the fortuitous fact that Mr. Elizalde

13 was on shore leave at the time that the Navy sent out an

14 email saying, Don't go to the Capitol or Don't go to

15 Washington on January 6.

16       Again, he should have known better on his own, but

17 the fact is that there is virtually no risk whatsoever that

18 Mr. Elizalde would ever reoffend his whole life.  He never

19 has up until now.  And his offense in this case, while I'm

20 not trying to minimize it, in context was very different

21 than most of the people there.

22       So I just don't see probation as being something

23 that would serve its typical function in a case like this.

24 And, again, I'm not making this up.  I mean, the Navy, the

25 military in general, does not abide people having to report.

1    I mean, he's an aircraft carrier -- he's a soldier -- a

2    sailor, I'm sorry, who's been on aircraft carriers a lot and

3    been deployed all over the place.  And you can't --

4          **THE COURT:**  Well, that depends surely on the

5    nature of the probation requirements.

6          **MR. BRENNWALD:**  Well --

7          **THE COURT:**  Put differently, and I don't know what

8    the answer to this would be, if someone is on probation and

9    rather than being required to come into the Probation Office

10   once every month --

11         **MR. BRENNWALD:**  Right.

12         **THE COURT:**  -- can call once every month --

13         **MR. BRENNWALD:**  Right.

14         **THE COURT:**  -- why would that be inconsistent with

15   service, the practical requirement I'm talking about?

16         **MR. BRENNWALD:**  Right.  Right.

17         Like I said, I've spoken to several naval folks

18   and their answer is always, We can't predict what the Navy

19   will do.  But it's not helpful.  And I get that I don't

20   think it's fair for Mr. Elizalde to receive special

21   treatment, but that's why in my memo I said, if we have to

22   offset it with something, he'd rather do more time in home

23   confinement or something so that he avoids testing the Navy

24   and see how they come down on him basically.

25         **THE COURT:**  But why is home confinement workable

1    for him if he's on an aircraft carrier?

2              **MR. BRENNWALD:**  Because if, for instance, this

3    Court gave him 30 days of home confinement starting today --

4              **THE COURT:**  He could work out his --

5              **MR. BRENNWALD:**  Yeah.

6              **THE COURT:**  -- when he'd have to be on leave

7    versus on a ship.

8              **MR. BRENNWALD:**  Right.  I mean, from what I

9    understand, if he is redeployed, it won't be for a number of

10   weeks at the earliest.  It takes time to get your orders,

11   et cetera.

12             So if he were to literally be told today, you have

13   30 days of home confinement, he won't be going anywhere for

14   30 days; so that would work.

15             He's been invited three times in the last few

16   months to the White House to be part of a ceremony honoring

17   POWs.  He's declined to fill out the form that he has to

18   fill out to go three times because he's embarrassed, because

19   they're going to do a background and they'll see this and

20   they'll say, Mr. Elizalde, we really wanted you as a sailor

21   to come, but we're not going to have you here.

22             He's paying for this in a lot of ways that the

23   government apparently doesn't realize.  But back to your

24   question, he doesn't have a problem with probation.  I just

25   think that we're tempting fate to do that.  And if the Court

1    decides that that's the appropriate way, then he'll deal

2    with it.  If he's let go, he's let go.

3            He's -- honestly, we've had a lot of discussions

4    about this.  And he's resigned to the fact that, you know,

5    if he's thrown away 17 years of his life because of a couple

6    hours that day, you know, I messed up.  You know?

7            He's apologized to me, Your Honor.  He's expressed

8    a lot of remorse to me over the time just talking about the

9    case, saying, you know, I really messed up.  I shouldn't

10   have been there.  I should have known better.  My curiosity

11   got the best of me but that's no excuse.

12           He didn't testify, so he didn't get up and say

13   everything that the government might have wanted him to say.

14   But he really is deeply sorry for what happened.  He's

15   embarrassed about it.  I think anybody, hopefully, who was

16   in the military would be mortified by having a criminal case

17   ever, especially one of this kind.

18           **THE COURT:**  So obviously, I've had a lot of cases,

19   a lot of January 6th cases generally and a lot of cases that

20   involved a guilty count on this particular count that we

21   have here.

22           **MR. BRENNWALD:**  Right.

23           **THE COURT:**  But most, if not all, of those

24   defendants pleaded guilty, didn't go to trial, so did accept

25   responsibility in that sense earlier.

1        **MR. BRENNWALD:**  Right.

2        **THE COURT:**  To what extent, in your view, should

3   that be relevant in my thinking here?  Obviously, if this

4   was a guidelines case, the guidelines range would likely be

5   higher here than a comparator because you wouldn't get a

6   two-level or three-level reduction for acceptance of

7   responsibility at least presumptively.  But we're not in a

8   guidelines case.

9        **MR. BRENNWALD:**  If it was a guidelines case, he

10  would have had a lower guideline because he had acceptance

11  is what you're saying?

12       **THE COURT:**  No, by not pleading guilty.

13       **MR. BRENNWALD:**  Oh, by not pleading, right.

14  Right.  Okay.

15       So let me answer that, Your Honor.  We discussed

16  the plea offer many times.  As the Court knows, when the

17  government decided to charge him, they didn't tell him at

18  that point.  They just said, Come back, we're going to

19  relocate you and he gets arrested when he gets back in the

20  country.

21       So this has had a big impact on him and it's

22  completely changed everything.  It's changed his

23  relationship with his wife, because he went to Spain, she

24  could live there with him.

25       But I say all this to say that we discussed the

1    plea a lot and he rejected it on the advice of counsel.  And

2    the advice of counsel was -- and this is my ignorance,

3    obviously, of the law -- is when I saw -- when I looked at

4    the elements of the offense and I looked at videos of him

5    and I read the instructions that have been given in other

6    cases talking about, you know, parading means -- the normal

7    meaning of parading, demonstrating means normal meaning of

8    demonstration, et cetera, we talked and I said, you know,

9    Mr. Elizalde, I don't see you parading here in a sense that

10   you're marching with a whole bunch of people with some

11   purpose in common.

12           I don't see you demonstrating.  You have a flag,

13   but I don't see you demonstrating.  I don't see that, so I

14   don't really know how you're going to factually admit to

15   plead to the facts that are necessary for a guilty plea.

16           So based upon multiple discussions over multiple

17   weeks about my view of the law, which obviously turned out

18   to be incorrect, he said, Okay.  Well, I trust you.  You've

19   been a lawyer a long time and I'll go with your judgment.

20           So he's never denied everything that's happened.

21   He thought that, well, Mr. Brennwald knows what he's talking

22   about.  Once again --

23           **THE COURT:**  Right.  One could admit the conduct

24   and then contest the legal sufficiency of the charges.  Fair

25   enough.

1          **MR. BRENNWALD:**  You mean one could plead guilty

2     and contest them or -- what do you mean?

3          **THE COURT:**  No.  I mean some defendants don't

4     acknowledge their conduct.  Others acknowledge their conduct

5     and say, but I'm not sure that that's actually a crime for

6     whatever reason.

7          **MR. BRENNWALD:**  Right.

8          **THE COURT:**  And I don't think -- I'm really making

9     your point in a way, which is to say Mr. Elizalde has

10    generally admitted what he did --

11         **MR. BRENNWALD:**  Right.

12         **THE COURT:**  -- and has just said -- well, but as

13    to certain of the offenses here -- I didn't either have the

14    relevant mens rea or I didn't parade or demonstrate.  But

15    not because he says "it wasn't me" or "that didn't happen"

16    or something like that.

17         **MR. BRENNWALD:**  Right.  Exactly.

18         You know, when you first questioned him about

19    whether he was satisfied with my services so far, his answer

20    was "very."  Clearly, my services weren't "very" because I

21    gave him bad advice about whether or not his conduct rose to

22    the level of parading and demonstrating.

23         And that's why he didn't take the plea.  It's not

24    because he was fighting or wanting to fight or any of that.

25    So I don't think that should be held against him in that

1    sense.

2            I put a lot in my memo already.  I don't want to

3    repeat myself.

4            **THE COURT:**  I have a pretty good handle on this

5    case I think it's fair to say.

6            **MR. BRENNWALD:**  Of course.

7            I do think and I would argue that the government's

8    response to the Court's question about probation and losing

9    his job is pretty harsh, and I think that, when deciding on

10   an outcome --

11           **THE COURT:**  It is one executive branch after all.

12           **MR. BRENNWALD:**  Yes.

13           The Court's job, as you know, is justice but

14   justice without mercy is problematic.  He had a bad

15   afternoon that was overcome by his curiosity.  And I know,

16   if he had it to do over again and could see everything --

17   and of course a lot of people can say that but I know he's

18   mortified and he's embarrassed.

19           And I'm hoping he can keep his job.  I didn't put

20   it in my memo but, if he does lose his job, he's going to

21   lose an incredible amount of benefits that would accrue to

22   him in three years.

23           **THE COURT:**  I say this all the time that all

24   things being equal, I would like people who are in front of

25   me to remain gainfully employed.  That's why I sometimes

1    stretch to allow people to stay on pretrial release or to

2    have conditions that allow them to keep working because I

3    think gainful employment is a benefit.  So I understand all

4    of those arguments.

5            But at the same time, I'm not going to fashion a

6    correct sentence merely for the purpose of allowing somebody

7    to keep a job if I thought, for example, that someone needed

8    to be incarcerated, then --

9            **MR. BRENNWALD:**  Right.

10           **THE COURT:**  -- the effects flow therefrom.

11           **MR. BRENNWALD:**  I know I'm not going to get the

12   chance to say this after you sentence him because, once you

13   sentence him, it's final.  But I do want to take this chance

14   to thank you for your very thoughtful consideration of the

15   case throughout.

16           **THE COURT:**  I'm just trying to do my job.

17           **MR. BRENNWALD:**  Thank you.

18           **THE COURT:**  But thank you.

19           I actually have a question for Probation.

20   Ms. Shaffer.

21           Good morning.

22           **PROBATION:**  Good morning, Your Honor.

23           **THE COURT:**  So walk me through a little bit about

24   the practicalities of probation in a situation like this.

25   Mr. Elizalde might be deployed.  He might be deployed

1   internationally, overseas.  Do you deal with people on

2   probation who were in those circumstances and, if so, how do

3   you handle it?

4           **PROBATION:**  So everybody gets travel restrictions;

5   however they have 30 days to put in approval for travel.

6           **THE COURT:**  Yes.  And I sometimes approve them,

7   yes.

8           **PROBATION:**  Right.  So as far as probation, that

9   would have to be 30 days in advance to know that.

10          **THE COURT:**  Okay.

11          **PROBATION:**  And we do have people go overseas,

12  different countries.  I do know, for intermittent

13  confinement, as they were talking about earlier, Maryland

14  does not do intermittent confinement.  So I did want to let

15  you know that but, as far as traveling, yeah, we do have the

16  30 days.

17          **THE COURT:**  I have run into many problems with

18  intermittent confinement --

19          **PROBATION:**  So have we.

20          **THE COURT:**  -- from various places.

21          So in addition to the requirement to get a

22  pre-approval for travel, just in general, someone's on

23  probation, what are their sort of basic check-in

24  requirements?

25          **PROBATION:**  It definitely depends on the person.

1    A lot of our January 6 cases are low, moderate, so they

2    don't have to -- a home inspection doesn't have to be done

3    or anything like that for 90 days at a time, as opposed to

4    like a high risk, which is every 30 days.

5            So sometimes that's just a phone call.  Sometimes

6    that's coming into the office.  It depends on if they have

7    drug testing.  So it's definitely on an individual basis.

8    And Maryland may do it differently if you transfer

9    supervision so...

10           **THE COURT:**  Right.

11           Okay.  Thank you.

12           **PROBATION:**  Thank you.

13           **MR. BRENNWALD:**  May I say something else?

14           I think I've had clients who lived outside of D.C.

15   who had a GPS monitor and that -- I'm not sure how that

16   would work going to the Navy every day.  I don't think that

17   would be a good idea but where you could monitor their

18   compliance with a curfew because I think even a home

19   confinement allows you to work.

20           So you can be home by 6 and not be able to leave

21   till 6 in the morning.  But that would require -- I think

22   there's a way to do it without an ankle bracelet but I'm not

23   sure.  But that's something that obviously would concern me

24   if he has to go into work and has to go through a metal

25   detector or whatever, which I don't know if he does because

1    he has a badge.

2           But, anyway, these are just all concerns that are

3    complicated and then --

4           **THE COURT:**  So let's go back to, so your proposal

5    of a period of home incarceration, basically starting today

6    or whenever it would be, would be what exactly?  What would

7    he be permitted to do during that period, go to work?

8           **MR. BRENNWALD:**  I would just say go to work,

9    right.

10          **THE COURT:**  Anything else?

11          **MR. BRENNWALD:**  Sorry?

12          **THE COURT:**  Anything else?

13          **MR. BRENNWALD:**  I mean, theoretically --

14          **THE COURT:**  Get groceries.

15          **MR. BRENNWALD:**  -- medical appointments, get

16   groceries, things like that, yeah, but I don't think -- you

17   know, any other activities he might do I think should be

18   restricted.  I mean, there needs to be some form of

19   punishment in that sense for it to count.  I am his lawyer

20   but I mean it makes sense.

21          But I don't know how one verifies what he's doing

22   other than the honor system if he's not going to wear a GPS.

23   And I am concerned about a GPS monitor on his ankle and how

24   that would work.

25          **THE COURT:**  It's definitely the case that other

1    jurisdictions can have GPS monitoring even for a case that's

2    pending here because, unfortunately, I had a few pretrial

3    defendants in Florida in a January 6th case clip their GPS

4    bracelets pretrial.

5             **MR. BRENNWALD:**  Right.

6             **THE COURT:**  And had to get located by the

7    marshals, and they were on pretrial supervision or whatever

8    one wants to call it in Florida.  So they were being

9    monitored on GPS.  We had a lot of discussions about the

10   appropriate conditions and then two of them decided that

11   they'd rather not.

12            **MR. BRENNWALD:**  Right.

13            **THE COURT:**  So it can be done.

14            **MR. BRENNWALD:**  Okay.

15            **THE COURT:**  I think I have it.

16            **MR. BRENNWALD:**  Thank you, Judge.  Do you want him

17   to come up here when you impose sentence, Your Honor?

18            **THE COURT:**  No, that's okay.

19            As always, before I pronounce the sentence, I'm

20   just going to summarize my understanding of the current

21   positions of the parties.

22            The government proposes a sentence of 36 months of

23   probation with conditions of 30 days of intermittent

24   confinement and 60 hours of community service.  As

25   discussed, no restitution here and the government leaves it

1    to me to decide what fine I should impose.

2           Mr. Elizalde asked for a period, perhaps 14 days

3    of home confinement, some community service and a fine and

4    no probation for the reasons we've discussed.

5           And Probation recommends no incarceration,

6    12 months of probation, a $2500 fine and a $10 special

7    assessment, which I think is required or at least

8    appropriate here.

9           I have to, of course, consider, in fashioning an

10   appropriate sentence, the 3553(a) factors.  Regarding the

11   nature and seriousness of the offense, I've said it now

12   40-plus times, the events of January 6th were extremely

13   serious.  Mr. Elizalde himself acknowledged that this

14   morning.

15          Many people entered the United States Capitol

16   while a joint session of Congress was meeting to certify the

17   results of the presidential election.  Many, many, many

18   people acted incredibly wrongly.  I'm not going to detail

19   all of the horrific conduct that I have watched in various

20   cases.

21          I think most important here is that Mr. Elizalde's

22   conduct was relatively mild.  He is, as he puts it, a

23   student of history.  He traveled to attend the rally at the

24   Ellipse.  He then traveled down to Congress.

25          Unlike others in the crowd, he didn't engage in

1  physical altercations, screaming, violence or rioting.  He

2  was, in my view, a passive observer for many of the events

3  that occurred that day.  That's not to excuse his behavior

4  whatsoever.

5          Again, he followed a crowd into the Capitol and

6  his presence, as I said before at trial, exacerbated a very

7  serious and contentious environment for law enforcement.  He

8  should have known that he was not supposed to be there

9  having walked past violent outbursts and observing people in

10  distress.

11          But Mr. Elizalde's conduct was not as serious as

12  many other January 6 defendants I have now sentenced, and it

13  was not even as serious as some defendants I have sentenced

14  on this very count.  In my view, this factor generally

15  weighs in his favor.

16          As to the history and characteristics of the

17  defendant, as we discussed today, he's an active member of

18  the Navy.  He's served honorably since June 20, 2007.  He

19  has no criminal history and no history of substance abuse.

20          Those personal characteristics tend generally to

21  weigh in his favor.  Though I agree with the government that

22  his then military service and the fact that he did what he

23  did on January 6th, notwithstanding the fact that he was

24  then an active military member, cuts against him.

25          I have to ensure, also, that the sentence I impose

1    protects the public, respects for the law and deterrence.

2    In my view, Mr. Elizalde is at a very low risk of

3    recidivism.  It is, of course, the case, while at the

4    Capitol on January 6th, that he saw evidence of disorder and

5    he didn't turn away.  Should have.  Frankly he should have

6    walked away right then.  He didn't.

7            But he also, as I said already, did not engage in

8    anywhere near the same kind of horrific conduct that I saw

9    out of others that day.  I also credit his expression of

10   remorse today.  I recognize that there are lots of reasons a

11   defendant doesn't plead guilty earlier.

12           I also recognize there are lots of reasons that a

13   defendant doesn't take the stand and testify at trial.  So

14   this is the first time we've heard from Mr. Elizalde and I

15   credit his expression of remorse.

16           I'm not going to suggest it is the most remorseful

17   statement I've heard but, on the spectrum of statements that

18   have been given by defendants, it is one of the more

19   remorseful or at least one of the more apologetic and

20   thoughtful statements I've heard.

21           In my view, Mr. Elizalde well knows never to

22   engage in this conduct again.  But I also have an obligation

23   to ensure that others are deterred from committing similar

24   crimes in the future.

25           As I've said before, January 6 was a horrific day.

1   The sentence I give must be a signal to others that it is

2   never acceptable to participate or encourage a riot, even to

3   express one's political beliefs, or even be around one and

4   not just walk away.  Being part of and around a violent riot

5   is simply unacceptable.

6          Turning now to what I have often said at this

7   point is a very relevant factor for me, given the number of

8   sentences I've personally imposed, that is the need to avoid

9   unwarranted sentencing disparities.

10         It seems to me the following things are true

11   without going through all of the cases.  When compared to

12   others who I have sentenced for the count of conviction that

13   we have here, Mr. Elizalde's conduct is pretty low on the

14   severity level.

15         While of course he entered and while of course he

16   was there, he didn't scream.  He didn't post on social

17   media.  He didn't take actions that could be read to have

18   riled up the crowd as many other defendants did that I've

19   had and who I've sentenced to this count.

20         He didn't smoke marijuana inside.  He didn't enter

21   through a broken window.  Even within the cohort of people

22   who pleaded guilty to the count that we have here, I think

23   Mr. Elizalde's conduct is relatively mild on January 6th.

24         What distinguishes him, however, are two things.

25   One is, of course, we went to trial.  So we didn't have your

1    traditional acceptance of responsibility at the beginning of

2    this case.  I've discussed that with Mr. Brennwald.

3              As I said before, I realize that defendants decide

4    to go to trial for various reasons, and Mr. Brennwald was

5    very open and honest about the nature of the discussions

6    about the plea agreement.

7              But also, as I said before, Mr. Elizalde, unlike

8    many whom I've sentenced already, was an active military

9    member and should, because of that -- and for of course all

10   the other reasons, but for that reason should have known

11   better.

12             Where does that leave me?  Where it leaves me is,

13   if it weren't for the fact that there's a risk, a potential

14   risk at least, that Mr. Elizalde's sentence here could

15   interfere with what has otherwise been honorable service in

16   the military, I would sentence him to a period of probation

17   with appropriate community service and the like but without

18   any intermittent confinement, because I think that that

19   would treat him more harshly than he deserves in light of

20   other defendants.

21             I've also, in my own experience and as I heard

22   from Probation earlier, intermittent confinement, while it

23   sounds great in a sense, can be a nightmarish logistical

24   problem.  And we would work through that, if I thought that

25   that was the appropriate sentence but I don't think so.  In

1    fact, I think that this would be a probationary sentence

2    with a period of community service.

3         The only question in my mind then is whether I

4    should just impose that and let the chips fall as they may,

5    so to speak, or if there is a different sentence that can be

6    fashioned that is akin to a probationary period but

7    looks -- in the sense that it is -- considering all of the

8    3553(a) factors, is akin to a probationary sentence but

9    reduces the risk that Mr. Elizalde will lose his job, not

10   because it's my job to ensure he doesn't lose his job but

11   because he has served our nation honorably, in general, and

12   because, as I said before, all things being equal, I like

13   people to be gainfully employed.

14        So if there are, put it this way, alternatives to

15   probation that, in my view, achieve all of the outcomes or

16   goals that a probationary period would achieve but without

17   that risk, I would be inclined to do that.

18        And as Mr. Brennwald said, there are certain goals

19   or ends to be achieved through probation that don't quite

20   fit here.  As I said, I think Mr. Elizalde is a low risk of

21   recidivism.  He doesn't have the need to check in over drug

22   abuse, substance abuse testing and the like.

23        So what does that mean?  In my mind it means I am

24   going to do the following:  First, I am imposing a fine of

25   $2500.  Second, I am imposing the special assessment of $10.

1          Third -- and I think most relevant here -- I'm

2    sentencing Mr. Elizalde to 30 days of home confinement.  And

3    we can work through the details exactly, but what I would

4    like to have happen is that Mr. Elizalde's permitted, while

5    on those 30 days of home confinement, to work, obviously to

6    be able to feed himself but to otherwise be at home.

7          I'm saying "home confinement."  It may be that I

8    am really saying home incarceration.  I'm not sure.  Why

9    don't we talk about that.  There's a nomenclature here and

10   perhaps we should talk about that because it may matter a

11   little bit just in terms of what I have in mind.

12          **PROBATION:**  Yeah, Your Honor, so you're talking

13   about home incarceration --

14          **THE COURT:**  Yeah.

15          **PROBATION:**  -- based off of what I'm thinking.

16   But in order to be permitted to work, go to religious,

17   hearings, anything like that, it would be home detention.

18   They would get windows to be able to go wherever they needed

19   to go for those purposes.

20          **THE COURT:**  So "home incarceration" means what

21   exactly in your mind?

22          **PROBATION:**  They cannot leave their home.  It

23   would just be like if they were incarcerated except at their

24   home.

25          **THE COURT:**  Except as perhaps authorized in unique

1    circumstances.

2           Okay.  And so "home detention" would have some

3    predetermined things one could do, perhaps with a curfew or

4    a GPS or something like that but that would be "home

5    detention."  Okay.

6           **PROBATION:**  Yes, yep.

7           **THE COURT:**  Mr. Brennwald?

8           **MR. BRENNWALD:**  Your Honor, I just asked

9    Mr. Elizalde what his typical work hours are, and they're

10   0700 to 4 p.m.  And he volunteered and this is -- I think,

11   tells you a lot about his honesty.

12          He said, I don't really need to have extra time to

13   shop.  He said, there's a shopping -- not center, but

14   there's a store on base.  So he could do that before he

15   leaves to go home.  So he doesn't need extra time --

16          **THE COURT:**  Implicit in what you are saying is

17   Mr. Elizalde, when he's here, I mean in the DMV so to speak,

18   physically goes to the base every day as part of his

19   employment?

20          **MR. BRENNWALD:**  Correct.

21          **THE COURT:**  And then there's the possibility of

22   his getting deployed at some point?

23          **MR. BRENNWALD:**  Correct.  But probably not for

24   30 days or more.

25          **THE COURT:**  Right.

1          **MR. BRENNWALD:**  My point is he doesn't need extra

2     time to go shopping.  And I don't say that to help him.  It

3     doesn't really help him to say that.  He is being honest

4     with the Court.  He's like I can shop there.  I don't need

5     to --

6          **THE COURT:**  But just to work through the different

7     options, so that would mean, just home incarceration, as we

8     just discussed, which would not allow him to leave his house

9     for 30 days, that would mean he couldn't appear for his job

10    at the base?

11         **MR. BRENNWALD:**  Right.

12         **THE COURT:**  And that would run the risk of his

13    getting terminated.  Right?

14         **MR. BRENNWALD:**  Yes.

15         **THE COURT:**  That's one.

16         Then you have probation, which we discussed

17    earlier, where he's on probation right now.  He could go to

18    work every day.  Right?

19         **MR. BRENNWALD:**  Right.

20         **THE COURT:**  But if it has a three-year tail or

21    something like that, then who knows what happens 16 months

22    from now or whatever.

23         And then home detention really is what you're

24    advocating for, which is allow him to go to work and come

25    back and be at home.

1          Okay.  So I'm going to do 30 days of home

2     detention, which is -- and the only exception -- so what

3     we're doing is you will have to be at home for 30 days.  The

4     only exception to that is to go to the base and to come back

5     from the base from 0700 to 4 p.m., to 1600.  Right.

6          And, of course, in the event that you have a

7     medical emergency or something like that, you can ask

8     Probation if you can -- or, you know, you could do it and

9     either ask for forgiveness after you've done it or if you

10    have a doctor's appointment or something like that you

11    really need to go to, you can ask in advance.

12         Ms. Shaffer, in terms of documenting this, what do

13    you need from me?  You've heard what I am envisioning, which

14    is home except for 0700 to 1600.

15              **PROBATION:**  Right.

16              **THE COURT:**  No other exceptions to that.

17              **PROBATION:**  Yeah, go ahead.

18              **THE COURT:**  No.

19              **PROBATION:**  You could also do curfew --

20              **THE COURT:**  Yeah.

21              **PROBATION:**  -- which gives him the 700 to 1600

22    hour and then cannot leave any time between then as opposed

23    to the home detention.

24              **THE COURT:**  Well, I mean I think it's important to

25    call it home detention, because I am thinking of it as a

1    slight substitute for incarceration which is itself a slight

2    substitute for probation.

3              It seems to me that it is a curfew in a way, but

4    what I'm saying is the only thing you are allowed to do

5    during your non-curfew period is go to work.

6              **PROBATION:**  Yeah.

7              **THE COURT:**  It's not like tomorrow he can, at

8    0800, go play golf.

9              **PROBATION:**  Okay.  Yeah, we can note that in his

10   special conditions that we send to, if you transfer

11   jurisdiction -- supervision to Maryland, we'll note that --

12             **THE COURT:**  I think I'm going to keep it.

13             **PROBATION:**  Keep it here?

14             **THE COURT:**  I'm going to keep it here.

15             **PROBATION:**  Okay.

16             **THE COURT:**  So I'm pronouncing the sentence

17   orally, and what I would just ask is that you work with

18   chambers on exactly how we paper this over so it is exactly

19   how I've thought of it.  Okay?

20             **PROBATION:**  Yes, absolutely.

21             **THE COURT:**  All right.  Very well.

22             **PROBATION:**  We can work on that order.  Thank you.

23             **THE COURT:**  Okay.  Thank you.

24             **MR. HOLVEY:**  Your Honor.

25             **THE COURT:**  Yes.

1          **MR. HOLVEY:**  How will -- will the Court be asking

2     for GPS monitoring to ensure enforcement of the home

3     detention or how is the Court envisioning ensuring

4     compliance?

5          **THE COURT:**  That's a good question.  I mean, it's

6     what I was hoping I would work through with Probation

7     because I think it depends on the interrelationship between

8     us, here, and Maryland.

9          **MR. HOLVEY:**  I see.  So to be determined?

10         **THE COURT:**  I think so, yes.

11         **MR. HOLVEY:**  Thank you, Your Honor.

12         **THE COURT:**  To be very clear, I am ordering, and

13    therefore this is subject to Court order, that you are to be

14    at home all hours of the day except 0700 to 1600 for the

15    sole purpose of going to work.

16         That order is binding on you and, should you

17    violate it, you may have issues about, you know, my opening

18    the sentencing or being held in violation of Court order.

19         In terms of how we ensure compliance with the

20    order, what I heard earlier from Ms. Shaffer is

21    that -- well, I heard from Mr. Brennwald that GPS might be

22    difficult with the job, and I just think it's TBD exactly

23    how we're going to enforce it.  Okay?

24         **MR. MANNING:**  Thank you, Your Honor.

25         **THE COURT:**  I understand the point though, of

1    course.

2            **MR. BRENNWALD:**  And, Your Honor, he doesn't live

3    on base just so we know.  So he has to be able to travel to

4    the base.

5            **THE COURT:**  I understand.  Yes, I understand.

6            Obviously, there's a right to appeal the sentence

7    I've imposed should you wish.  Once the judgment has been

8    entered, you have 14 days to appeal.  You also have certain

9    rights to challenge the sentence collaterally under

10   Section 2255.

11           But for present purposes, Mr. Brennwald, are there

12   any topics you'd like to discuss today, any further ones?

13           **MR. BRENNWALD:**  No, Your Honor.  Thank you.

14           **THE COURT:**  From the government?

15           **MR. HOLVEY:**  Nothing at this time, Your Honor.

16           **THE COURT:**  Okay.  Thank you, all.

17           **THE DEFENDANT:**  Your Honor, can I say something

18   real quick?

19           **THE COURT:**  Yes.

20           **THE DEFENDANT:**  Thank you, Your Honor, for -- all

21   this time, I have been treated with dignity and respect, and

22   I do understand my actions and I truly, truly feel sorry.

23           **THE COURT:**  Yes.  I got that from your prior

24   statement.

25           As I said before, I've now, for better or worse,

1  heard a lot of people in the January 6 context purport to

2  express remorse, and a lot of times they haven't or they've

3  said what they think they need to say but they haven't

4  really meant it.  And I thought you meant it today, so that

5  was important to me.

6          So just to be very clear, court-ordered sentence,

7  home detention permitted to travel to the base to work from

8  0700 to 1600 and then go back to the house for 30 days.  If

9  you violate that court order, you're going to have a

10  problem.  And we will work with Probation to arrive on

11  exactly the best way to monitor that.  Okay?  Thank you,

12  all.

13          (Proceedings concluded at 11:10 a.m.)

14

15

16

17

18

19

20

21

22

23

24

25

1 **C E R T I F I C A T E**

2

3          I, **Lorraine T. Herman, Official Court Reporter,**

4   certify that the foregoing is a true and correct transcript

5   of the record of proceedings in the above-entitled matter.

6

7

8

9          May 2, 2024              /s/ Lorraine T. Herman
                **DATE**                    **Lorraine T. Herman**
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25